**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bedford Signals Corporation, | No. CV-24-00241-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Resonant Sciences LLC, | |
| Defendant. | |

Pending before the Court is a motion to transfer venue filed by Resonant Sciences LLC ("Defendant" or "Resonant"). (Doc. 15.) For the following reasons, the motion is granted.

## BACKGROUND

This is a tale of three contracts and two competing forum-selection clauses. Bedford Signals Corp. ("Plaintiff" or "Bedford"), an Arizona-based engineering firm and defense contractor, developed a defense-related software program ("the Software"). To facilitate mutual business pursuits with Defendant, an Ohio-based defense contractor, that involved Plaintiff granting Defendant access to the Software, the parties entered into various agreements regarding permissible and impermissible uses and disclosures of certain proprietary information pertaining to the Software.

I.     The Agreements

A.     **The 2015 NDA**

The first agreement at issue in this dispute, executed in March 2015, is entitled

"Nondisclosure and Proprietary Information Agreement" (hereinafter, "the 2015 NDA"). (Doc. 16-1.)[1] The 2015 NDA stated that "each Party desires to disclose to the other certain information relating to various mutual business pursuits and programs," defined what did and did not constitute "Proprietary Information," and limited the receiving party's use and disclosure of the Proprietary Information. (*Id.* at 2-3.) "Proprietary Information" was defined as "written or documentary, recorded, machine readable, or other information in a tangible, electronic or other form, which is received by one Party from the other Party," subject to various exceptions. (*Id.* at 2.) The 2015 NDA restricted use of "Proprietary Information" in that "[t]he receiving Party shall not use, nor cause to be used, Proprietary Information of the disclosing Party to the economic detriment of the disclosing Party" and in that the information could be used and reproduced "only to the extent necessary for the purpose set forth" in the agreement. (*Id.* at 3.) That purpose was not clarified in the 2015 NDA except, it appears, by reference to the parties' rather vaguely worded "various mutual business pursuits and programs." (*Id.* at 2.) Indeed, the 2015 NDA never mentioned the Software or even used the word "software." However, Plaintiff alleges that the 2015 NDA restricted Defendant's use of the Software—specifically, Plaintiff alleges that under the 2015 NDA, Defendant "was permitted to use" the Software in demonstrations with two other entities (Matrix Research and Raytheon) but "was restricted from use" of the Software "for any other purpose other than performance of the Matrix and Raytheon contracts." (Doc. 1-4 at 5-6 ¶¶ 16-18, 26.)[2]

The 2015 NDA included a choice-of-law clause providing that it "shall be subject to, and construed in accordance with, the laws of the State of Ohio without regard to the conflict of law provisions of that state." (Doc. 16-1 at 5.) However, it contained no forum-selection clause, stating only that "[i]f any dispute arises under this Agreement which

---

[1] Defendant filed a copy of the 2015 NDA and Plaintiff did not dispute its authenticity. The other two agreements were filed by Plaintiff as attachments to the complaint and Defendant did not dispute their authenticity.

[2] This order cites the redacted version of the complaint, which is available to the public (Doc. 1-4 at 2-18), and its attachments (*id.* at 19-44.) A sealed, unredacted version of complaint and its attachments is available to the Court. (Doc. 14.)

cannot be resolved amicably, either Party may seek recourse in a court of competent jurisdiction." (*Id.*)

B.  **The SDA**

The second agreement at issue in this dispute, executed in October 2016, is entitled "Software Demonstration Agreement" (hereinafter, "the SDA").  (Doc. 1-4 at 25-35.) Plaintiff alleges that the purpose of the SDA was to better "protect its intellectual property" after Defendant allegedly misused the Software in two ways that were impermissible under the 2015 NDA—by applying for a patent of an invention that used a feature of the Software that "without said feature, would render the invention impossible" and by making "demonstrations to potential investors to seek funding."  (Doc. 1-4 at 5-6 ¶¶ 21-27.)  The SDA was more specific in its terms than the 2015 NDA.  Its stated "purpose" was to "set[] forth the terms and conditions for the installation, use, test, and support of [the Software] at a Designated Site[3] using Designated Equipment[4] prior to formal product release."  (Doc. 1-4 at 25.)  "Software" was "defined as machine-readable, machine-executable versions of the software and firmware products specified in Schedule A[5] (or any Purchase Order referencing [the SDA]), including Documentation,[6] media, binders, and printed materials, and any copies or portions thereof," as well as "any patches, updates, and supplements to [the] original Software if provided to [Resonant] by and at [Bedford's] sole discretion." (*Id.*)[7]  The SDA defined "Permitted Use" as "the testing, demonstration, trial, and other evaluative (but not any operational) use of the Software."  (*Id.* at 26.)

---

[3]     "Designated Site" was defined as "any site, whether [Resonant's] location or a customer location, provided that there is a remaining copy of the Software authorized under [the SDA] to cover each location."  (Doc. 1-4 at 35.)

[4]     This term does not appear to be defined in the SDA.

[5]     The description of the products in Schedule A is highly technical and partially redacted per the Court's sealing order (Doc. 13), but an understanding of the technical details of the Software is not necessary for the purposes of this order.

[6]     "The term 'Documentation' refers to all manuals, specifications, drawings, and instructions furnished to [Resonant] for use with the Software."  (Doc. 1-4 at 25.)

[7]     There is no distinction between "Software" as defined in the SDA and "the Software" as defined in this order—it is the Court's understanding that they are one and the same.

A section of the SDA entitled "License Grant" provided Resonant with the right to use the Software in certain ways that were previously not permissible under the 2015 NDA and then set forth in more detail other uses that remained impermissible. (*Id.* at 26-27.) That section, in its entirety, stated as follows:

In consideration of [Bedford's] payment of the Evaluation Fee[8] and for the license and the rights granted herein, [Resonant] agrees to the terms and conditions set forth herein:

3.1. [Bedford] grants to [Resonant] a personal, non-exclusive, non-transferable, non-sublicensable limited License to use the Software and Documentation at the Designated Sites, as specified in Schedule A, solely for the Permitted Use of the Software during the Term of this license, as set forth in Section 5.

3.2. [Resonant] has the right to install, execute, and run four (4) trialcopies [sic] of the Software at the Designated Sites.

3.3. Except as expressly permitted under this Agreement, [Resonant] shall not, and shall not permit others to:

(a) grant any sublicense for all or part of the Software;

(b) use the Software in conjunction with any other software, date, or equipment in such a manner as would cause the resulting product to infringe upon any Intellectual Property Rights of third parties;

(c) copy the Software, except for backup or archival purposes and provided that each such copy of the Software is subject to the terms of this Agreement;

(d) reverse engineer, disassemble, decompile, decode, or adapt the Software, or otherwise attempt to derive or gain access to the Software's source code, in whole or in part;

(e) modify, correct, adapt, translate, enhance, or otherwise prepare derivative works or improvements of the Software or Evaluation Materials.[9]

---

[8] As an aside, Section 8 of the SDA, entitled "Fees," seems to contradict the assertion that Resonant needed to pay an "Evaluation Fee": "[Resonant] shall not pay to [Bedford] any license fee for the licenses granted in Section 3 for evaluation and demonstration." (Doc. 1-4 at 30.) However, this apparent discrepancy has no impact on this analysis.

[9] "Evaluation Materials" were defined as "the Software in object code form and the Documentation, and any and all (a) copies, reproductions, modifications, enhancements, adaptations, translations and other derivative works of, and (b) inventions, improvements, know-how, specifications, performance characteristics, designs, plans, methods, procedures, processes, techniques, software, technology, concepts, information or materials whatsoever (other than usage data) comprising, relating to, based on or arising out of the Software or Documentation, in whole or in part and however and by whomever originated, including, without limitation, by any technology or device or by [Bedford], [Resonant], an Authorized User or any other Person." (Doc. 1-4 at 25.) "Usage Data" was

> (f) transfer, assign, rent, lease, or sublicense, the Software, Documentation, or Evaluation Materials to any third party on a temporary or permanent basis;
>
> (g) use the Software except as expressly permitted in this Agreement.
>
> 3.4. All rights not specifically granted to [Resonant] in this Agreement are retained by [Bedford].

(*Id.*)

In addition to granting Resonant the license to use the Software in certain ways that were previously impermissible under the 2015 NDA, the SDA imposed upon Resonant two new obligations[10]: (1) "to provide timely feedback, which may include bug reports, conferences with [Bedford's] representative and/or written evaluations, to [Bedford] in relation to the Software," and (2) "to immediately notify [Bedford] if [Resonant] becomes aware of any actual or potential claims by a third party arising in respect [Resonant's] use of the Software." (*Id.* at 27.) The SDA also imposed upon Resonant a few new restrictions—Resonant agreed (1) "not to remove from the Software or Documentation any copyright notices embedded thereon or therein which acknowledge that [Bedford] has a copyright, trademark, and other intellectual property interests in the Software, as the case may be," (2) "not to remove any references in or on the Software or Documentation to [Bedford's] name," and (3) "not to use the Software in contravention of any law." (*Id.*)

In addition to covering permitted and impermissible uses of the Software, the SDA contained a section requiring Resonant not to disclose certain "confidential or proprietary

---

defined as "all data, information, materials, and other content of any type and in any format, medium, or form, whether audio, visual, digital, screen, GUI, or other, that is processed by, for, or on behalf of [Resonant] by or through any device, system, or network, including, but not limited to, any and all works, inventions, data, analyses, and other information and materials resulting from any use of the Software, Documentation, or Evaluation Materials by [Resonant] or any Authorized User under or in connection with this Agreement, except that Usage Data does not include any Evaluation Materials or any data, information, or content, including, but not limited to, any GUI, audio, visual, or digital or other display or output, that is generated automatically upon executing the Software without additional user input. All output, copies, reproductions, improvements, modifications, adaptations, translations, and other derivative works of, based on, derived from, or otherwise using any Usage Data are themselves Usage Data." (*Id.* at 26.)

[10] An obligation is something one must do; a restriction is something one may not do. The parties lumped these together in a section entitled "obligations." For clarity's sake, the Court has separated them.

information including, but not limited to, trade secrets, technology, information pertaining to business operations and strategies, and information pertaining to customers, pricing, and marketing, and specifically further includ[ing] (a) the Evaluation Materials; (b) the Usage Data; and (c) the terms and existence of [the SDA]." (*Id.* at 28.) The SDA specified that Resonant still did not have any obligation with respect to the categories of information deemed "Non-Proprietary Information" in the 2015 NDA. (*Id.* at 28-29; Doc. 16-1 at 2.) Like the 2015 NDA, the SDA stated that confidential information could be used only as "necessary" under the contractual terms and never to Bedford's "detriment" and that Resonant would use reasonable care in safeguarding the information from disclosure to unauthorized third parties. (Doc. 1-4 at 29-30; Doc. 16-1 at 2-3.)

Section 5 of the SDA provided that the term of the agreement was "the longer of two (2) years or to the completion of any outstanding [statement of work] or [purchase order] unless terminated as provided herein." (Doc. 1-4 at 28.) Section 9 governed how the parties could terminate the agreement. (*Id.* at 30-31.) Section 9.4 provided that upon the expiration of the term or the termination of the agreement, Resonant would "immediately discontinue all use of and permanently erase . . . all copies of the Software, Documentation, and Evaluation materials, as well as any other Confidential Information of Bedford Signals obtained, made, or authorized to be made by [Resonant]" and "within ten (10) days of termination or expiration of this Agreement, return or cause [to] be returned to Bedford Signals or, with Bedford Signals' written approval, destroy or cause to be destroyed all materials provided under this Agreement, including, but not limited to Software, Documentation, Evaluation Materials, and any copies . . . ." (*Id.* at 31.)

Section 6 of the SDA emphasized that the Software would remain Bedford's intellectual property. (*Id.* at 28.)

Section 12 of the SDA contained choice-of-law and forum-selection clauses stating that the SDA "will be governed by and construed in accordance with the laws of the State of Arizona" and that "any dispute regarding this Agreement or the rights and obligations herein will be heard in the state or federal courts having jurisdiction for Maricopa County,

Arizona." (*Id.* at 32.)

In Section 15 ("Miscellaneous"), the SDA provided as follows:

> This Agreement, including its attachments and all Statements of Work, constitutes the entire agreement between the Parties with respect to the subject matter hereof. All prior agreements, understandings and proposals, oral or written, between the Parties with respect to the subject matter hereof are null and void and superseded by this Agreement. This Agreement may only be modified or amended by a writing signed by both Parties. If any provision of this Agreement is determined to be invalid or unenforceable in whole or in part, the remaining provisions will continue in full force and effect.

(*Id.* at 33.)

## C. **The 2018 NDA**

The third agreement at issue in this dispute, executed in January 2018, is entitled "Mutual Non-Disclosure Agreement" (hereinafter, "the 2018 NDA"). (Doc. 1-4 at 20-23.) The 2018 NDA states that Resonant and Bedford "seek to continue their discussions relating to ongoing mutual business pursuits and programs, which may require the disclosure of certain confidential and proprietary information ('Purpose'), and the Parties seek to keep such confidential and proprietary information disclosed confidential." (*Id.* at 20.)

Section I of the 2018 NDA sets forth the definition of "Proprietary Information," which includes:

> (a) any written information, including customer information or customer's own proprietary and/or confidential information, drawings, designs, specifications, formulations, computer design (CAD) and similar model files, JT model files, instructions, test results, samples, business plans, ordering and shipment data, schedules, test market, product and package designs and sizes, cost or pricing data, inventions, ideas, manufacturing and marketing plans and other data, and related technical and commercial information, software code, as well as all information of a technical, engineering, operational, financial or economic nature or which is related to product design and development or business planning, which is either marked "PROPRIETARY," contains a proprietary notice clause, or which Disclosing Party would reasonably believe to be confidential; (b) information which is furnished orally, if it is of the type and content reasonably understood to be confidential and the oral communications are necessary to understand Proprietary Information; (c) any item of hardware, including samples, devices and any other physical embodiments, if an appropriate label is placed on such hardware identifying such hardware as containing Proprietary Information, or if the information contained in any such hardware would reasonably be understood by Disclosing Party to be confidential; (d) [classified

- 7 -

1

2

3

information under any] Executive Order or statute that prohibits the unauthorized disclosure of information in the interest of national security; and (e) unclassified information that meets the standards for classification and is in the process of a classification determination . . . .

4

(*Id.*)

5

6

7

8

9

10

11

12

13

14

15

Section II of the 2018 NDA, entitled "Non-Disclosure and Limited Use of Proprietary Information," includes certain restrictions on disclosures to third parties and requires that Resonant "not copy or otherwise reproduce the Proprietary Information in any form except as required to accomplish the Purpose of this Agreement and only with the written consent of the Disclosing Party." (Doc. 1-4 at 21.) As for authorized copies or reproductions, they "shall (i) be treated as Proprietary Information under this Agreement, (ii) remain the property of [Bedford], and (iii) contain any and all confidential or proprietary notices or legends which appear on the original." (*Id.*) The 2018 NDA requires that Resonant "use the Proprietary Information only for the strictly limited Purpose," *i.e.*, in furtherance of the parties' ongoing mutual business pursuits and programs, "and for no other purpose whatsoever." (*Id.*)

16

17

18

19

20

Section III of the 2018 NDA states that the "confidentiality and limited use obligations of [the 2018 NDA] shall not apply" to certain categories of materials and essentially repeats the clause in the SDA stating that Resonant still did not have any obligation with respect to the categories of information deemed "Non-Proprietary Information" in the 2015 NDA. (*Id.* at 21; Doc. 16-1 at 2; Doc. 1-4 at 28-29.)

21

22

23

24

25

26

Section IV of the 2018 NDA emphasizes that the Proprietary Information would remain Bedford's intellectual property and states that "[n]o disclosure of Proprietary Information shall be construed as granting or conferring upon Receiving Party, expressly, impliedly or otherwise, any licenses or other rights under any patents, trademarks or any other intellectual and/or proprietary rights which Disclosing Party now owns or acquires." (Doc. 1-4 at 21.)

27

Section VIII of the 2018 NDA discusses the scope of the agreement:

28

This Agreement shall become effective as of the date first stated below and shall remain in effect until such time as any Party provides written notice that

the Party is terminating this Agreement. The Parties acknowledge that they may have participated in prior discussions where confidential and proprietary information may have been disclosed by a Party, and each Party agrees that this Agreement shall govern the discussions, including, but not limited to, any materials provided prior to the execution of this Agreement. The Parties agree that this Agreement supersedes [the 2015 NDA]. As of the Effective Date, this Agreement governs the Parties' confidentiality obligations relating to all information exchanged over the course of [the 2015 NDA]. The Parties further agree that the Agreement governs any and all discussions where confidential and proprietary information was exchanged between March 17, 2015 and the Effective Date.

(*Id.* at 22.)

Section VIII also contains provisions regarding returning Proprietary Information:

Upon termination of the Agreement, Receiving Party shall, at Disclosing Party's expense, promptly return to Disclosing Party all originals and copies of writings and hardware in its possession that contain Proprietary Information. If any writing or hardware has been destroyed, an adequate response to a return request by Disclosing Party will be written notice, executed by Receiving Party, that such writing or hardware has been destroyed. The Receiving Party shall not retain any originals or copies of any Proprietary Information. Notwithstanding the foregoing, all confidentiality and nondisclosure and limited use obligations, including publicity obligations, the obligation to return Proprietary Information and notice of any legal request, and intellectual property ownership rights shall permanently survive any termination of this Agreement.

(*Id.*)

Section X of the 2018 NDA contains the following choice-of-law and forum-selection clauses:

The Parties agree that any dispute arising from the terms of this Agreement shall be governed in accordance with the laws of the State of Ohio without regard to the conflict of laws, and all disputes shall be venued exclusively in either (a) the Greene County, Ohio Court of Common Pleas, or (b) the United States District Court for the Southern District of Ohio (Dayton).

(*Id.* at 23.)

Section X of the 2018 NDA also contains the following clause: "This Agreement constitutes the entire agreement between the Parties and supersedes any prior discussions or agreements, whether oral or written, between the Parties regarding the subject matter herein." (*Id.*)

…

…

II.    The Complaint

The complaint opens with this description of the "nature of the case":

> This is a breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment (in the alternative), and tortious interference action brought by Bedford against [Resonant], a key-partner-turned-competitor of Bedford.  In March 2015, the parties entered into [the 2015 NDA] which granted Resonant permission to use Bedford software to test Resonant's hardware under contracts with Matrix Research and Raytheon. The agreement did not allow Resonant to use the software for any other purposes.  In February 2016, Resonant filed an application for a United States Patent containing six graphical figures generated depicting Bedford software, publicly releasing the figures without Bedford's knowledge or permission.  In October 2016, after Bedford was made aware that Resonant was impermissibly using its software in test demonstrations for marketing purposes, the parties entered into [the SDA] which allowed Resonant to use the software in connection with fund-seeking demonstrations, but protecting [sic] Bedford's intellectual property in the software.  Later, in January 2018, Resonant offered [the 2018 NDA] with Bedford, which both parties signed. The same day, Resonant sent Bedford an unsolicited offer to purchase exclusive ownership of the Bedford software, alleging that Resonant needed exclusive ownership of the software in the next several days.  Resonant stated that it was selected for a contract by the United States [redacted] but to obtain the desired contract, Resonant needed exclusive ownership of Bedford's intellectual property.  The offer was restrictive and low, and Bedford did not accept the terms of the deal.  Three days later, Resonant terminated their demonstration license and claimed that it permanently erased all materials related to the software.  Bedford requested certification of destruction on January 22 and January 25, 2018, which Resonant provided.  Soon after, the Department of Defense awarded Resonant a [redacted] in October 2018, and a follow-on to that contract for [redacted] in September 2020.  Since, Bedford has been denied information related to the contracts, including denials to requests for information related to the source code in the classified contracts. Bedford files this action against Resonant for improperly using Bedford software to obtain both government and commercial contracts in violation of [the SDA] and related non-disclosure agreements.

(Doc. 1-4 at 1-2 ¶ 1.)

More specifically, the complaint alleges that the 2018 NDA "had a stated purpose that Resonant would use Bedford's proprietary information for use in writing proposals and reports for the mutual benefit of each business" and that "[h]undreds of proprietary documents," including but not limited to "code for Bedford's algorithms, snapshots of Bedford's graphical user interface, and test results obtained from the use of the software," "were sent to Resonant under the NDAs" and therefore "were not authorized to be used solely for Resonant's benefit, or counter to Bedford's interest."  (*Id.* at 9 ¶¶ 56-57.) "Possessing any original or copy of" or having "[i]ntimate knowledge of" the source code

1   for the Software "would make reverse engineering or derivative development possible."
2   (*Id.* ¶¶ 60-61.)  Resonant sent Bedford the 2018 NDA on January 16, 2018, and both parties
3   signed it.  (*Id.* at 7 ¶ 36.)  "Three days later, on January 19, 2018, Resonant terminated the
4   [SDA]."  (*Id.* at 8 ¶ 46.)  Resonant sent a "certificate of destruction" on January 22, 2018,
5   "insinuating that . . . all Resonant employees in possession of any relevant Bedford
6   information destroyed the information and certified that destruction of information."  (*Id.*
7   at 9 ¶ 59.)  Nevertheless, the complaint alleges that "Resonant continued to use the Bedford
8   software" and "misrepresented Bedford's continued ownership of the Bedford software in
9   its pursuit of government contracts," which Resonant obtained "due to the utilization of
10  Bedford intellectual property."  (*Id.* at 10 ¶¶ 64-69.)  The complaint asserts that "[i]f
11  Resonant were to have 'independently' developed their own version of the Bedford
12  software with the same capabilities prior to its [redacted] award, the independent
13  development would be a breach of [the SDA]" and alleges that "[u]pon information and
14  belief, Resonant retained pieces of Bedford proprietary information and either used it,
15  reverse engineered the source code, or created a derivative work to be used in performance
16  of the contract."  (*Id.* at 10 ¶¶ 70-71.)

17       The complaint asserts four claims.  Count One is labeled "breach of contract."  All
18  of the paragraphs in that section, aside from ¶ 91, which "incorporates by reference the
19  allegations in the previous paragraphs," focus exclusively on the SDA, highlighting
20  provisions restricting Resonant "from using Bedford's confidential information" to
21  Bedford's "detriment" and from reverse-engineering the Software or preparing derivative
22  works, and on Resonant's alleged failure to erase the Software and other confidential
23  information after terminating the SDA and alleged use of the Software (or reverse-
24  engineered or derivative works) to obtain government contracts.  (*Id.* at 13-14 ¶¶ 92-100.)

25       Count Two asserts that "Resonant breached its duty of good faith and fair dealing
26  under each of the three contracts between the parties [*i.e.*, the 2015 NDA, the SDA, and
27  the 2018 NDA] by directly or indirectly using Bedford's software to perform [government]
28  contracts," and also that "Resonant breached its duty of good faith and fair dealing under

the 2015 NDA by using the software in connection with securing" a patent that predates the SDA. (*Id.* at 15 ¶¶ 106-07.)

Count Three, "unjust enrichment (in the alternative)," asserts that Bedford "received nothing" from certain government contracts that Resonant obtained "by using Bedford's software in demonstrations and performance." (*Id.* ¶¶ 110-15.)

Count Four, "tortious interference with a business expectancy," is premised on the assertion that "[h]ad Resonant been selected for a contract based on the use of Bedford's software, Bedford would expect compensation for the use of its software in performance of said contract." (*Id.* at 16 ¶ 122.) Bedford's theory is that Resonant should have "brought Bedford in as a third-party" to Resonant's government contracts and that Resonant's failure to do so was "interference" with Bedford's "opportunity" to benefit from Resonant's government contracts. (*Id.* at 17 ¶¶ 126-27.)

III.    Procedural History

On January 3, 2024, Plaintiff initiated an action against Defendant in Maricopa County Superior Court. (Doc. 1-2 [state-court docket sheet].)

On February 5, 2024, Defendant timely removed the action to this Court based on diversity jurisdiction. (Doc. 1.)

On February 26, 2024, Defendant filed the pending motion to transfer venue. (Doc. 15.) The motion is now fully briefed. (Docs. 19, 21.)[11] Both sides requested oral argument.

On June 28, 2024, the Court issued a tentative decision. (Doc. 24.)

On July 8, 2024, the Court heard oral argument. (Doc. 25.)

**DISCUSSION**

I.    The Parties' Arguments

Defendant contends this action must be transferred, in its entirety, to the Southern District of Ohio pursuant to the forum-selection clause in the 2018 NDA. (Doc. 15.)

---

[11]    On February 26, 2024, Defendant also filed a motion to dismiss. (Doc. 16.) That motion is also now fully briefed. (Docs. 20, 22.)

According to Defendant, the 2018 NDA "governs the parties' use and disclosure of 'Proprietary Information' exchanged prior to and after January 16, 2018, which includes Bedford's Software" and "contains an integration clause providing that it 'supersedes any prior discussions or agreements, whether oral or written, between the Parties regarding the subject matter herein.'" (*Id.* at 3.) Defendant argues that the "subject matter" of the 2018 NDA is broad enough in scope to cover the terms of the SDA, such that all of the claims in the complaint, including the claim for breach of contract that points to the terms of the SDA, are subject to the 2018 NDA's forum-selection clause. (*Id.* at 6-10, 12-15.) Defendant further argues that the 2018 NDA's forum-selection clause is enforceable and mandatory (*id.* at 10-11) and that the public-interest factors do not weigh against transfer (*id.* at 15-17).

Plaintiff opposes transfer, arguing that the forum-selection clause in the SDA remains valid after the execution of the 2018 NDA because (1) "[e]ven though the parties explicitly stated that the 2018 NDA superseded the 2015 NDA, the 2018 NDA does not mention [the SDA]," (2) "three days after executing the 2018 NDA . . . Resonant took a separate action to terminate [the SDA]," (3) the "Purpose" sections of the SDA and 2018 NDA differ in verbiage, and (4) the 2018 NDA uses the word "software" only once and "in the context of 'software code,'" which, according to Plaintiff, does not refer to the Software. (Doc. 19 at 3-6, 8-11.)[12] Plaintiff also argues that Arizona law, not Ohio law, should govern whether the 2018 NDA's forum-selection clause invalidates the SDA's forum-selection clause. (*Id.* at 9-11.) Plaintiff argues that the SDA "is the sole basis for Plaintiff's Breach of Contract Claim" in Count One and "[t]he 2018 NDA is only relevant as one of the sources for the implied covenant of good faith and fair dealing owed by all parties in a contractual relationship in Count II." (*Id.* at 3.) Plaintiffs adds: "[T]his dispute does not arise out of the terms of the 2018 NDA." (*Id.* at 9.) Alternatively, Plaintiff contends—in a footnote to its response to the motion to dismiss—that "[e]ven if Count II

---

[12] Plaintiff also devotes a short section to arguing that the SDA did not supersede the 2015 NDA (Doc. 19 at 6-7), a question the Court need not resolve, as it does not affect whether this case should be transferred to Ohio.

- 13 -

arguably stated independent claims for breach of the implied covenant of good faith and fair dealing arising under not just the [SDA], but also [the 2015 NDA] and [the 2018 NDA], those claims could be severed and transferred to the Southern District of Ohio." (Doc. 20 at 4 n.1.)

In reply, Defendant asserts that Plaintiff's argument that the 2018 NDA is not broad enough to encompass the same subject matter as the SDA—*i.e.*, the Software—"is inconsistent with [Plaintiff's] own allegations, and requires an untenable interpretation of the broad and sweeping language of the 2018 NDA." (Doc. 21 at 4-5.) Defendant contends that "as a matter of contract interpretation, the term 'Proprietary Information'—as used in both the 2015 NDA and the successor 2018 NDA—includes Bedford's Software" and the allegation in the complaint that the 2015 NDA "govern[ed] Resonant's use of Bedford's Software in 2015" bolsters this conclusion. (*Id.* at 7.) Defendant argues that it follows that "the parties also intended for the 2018 NDA—which expressly superseded the 2015 NDA—to govern the parties' use of the Software from January 16, 2018 forward, even if they did not mention the Software by name." (*Id.*) Defendant then discusses various similarities in the SDA and 2018 NDA's contractual terms and asserts that the 2018 NDA "cover[s] the conduct on which [Plaintiff's] breach of contract claim[] is based." (*Id.* at 8-9.) Defendant adds: "Given that the 2018 NDA is more restrictive than the 2016 SDA on use (it grants no license for use of the Software), and the 2016 SDA does not provide for any specific remedies, there is no reason for [Plaintiff] to rely on the 2016 SDA to assert its claims, other than to avoid the mandatory forum selection clause in the 2018 NDA." (*Id.* at 9.) In short, Defendant argues that the forum-selection clause in the SDA cannot govern acts that occurred after January 2018 because the 2018 NDA "superseded all prior agreements regarding the Software." (*Id.*)[13]

---

[13] Alternatively, Defendant argues that "[i]f the Court concludes that the 2018 NDA is unclear, and that the question cannot be resolved without additional evidence, judicial efficiency nevertheless counsels in favor of transfer to the Southern District of Ohio" because Bedford already implicitly conceded that some of the claims may need to be transferred and "[s]plitting claims that relate to the same transactions and events would not further the interests of judicial efficiency." (*Id.* at 9-10.)

## II.    Legal Standard

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  28 U.S.C. § 1404(a).  "[A]ll parties have consented" where "the parties have agreed by contract."  *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 59 (2013).  "Section 1404(a) therefore provides a mechanism for enforcement of forum-selection clauses that point to a particular federal district."  *Id.*

"In the typical case not involving a forum-selection clause, a district court considering a § 1404(a) motion . . . must evaluate both the convenience of the parties and various public-interest considerations."  *DePuy Synthes Sales, Inc. v. Howmedica Osteonics Corp.*, 28 F.4th 956, 967 (9th Cir. 2022) (quotation omitted).  "The calculus changes, however, when the parties' contract contains a valid forum-selection clause, which represents the parties' agreement as to the most proper forum."  *Atl. Marine*, 571 U.S. at 63 (cleaned up).  Because "enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system," "a valid forum-selection clause should be given controlling weight in all but the most exceptional cases."  *Id.* (cleaned up).

"The presence of a valid forum-selection clause requires district courts to adjust their usual § 1404(a) analysis in three ways."  *Id.*  "First, the plaintiff's choice of forum merits no weight.  Rather, as the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted."  *Id.*  "Second, a court evaluating a defendant's § 1404(a) motion to transfer based on a forum-selection clause should not consider arguments about the parties' private interests" and instead "may consider arguments about public-interest factors only."  *Id.* at 64.  This is so because "[w]hen parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation."  *Id.*  "Third, when a party bound by

a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules—a factor that in some circumstances may affect public-interest considerations. A federal court sitting in diversity ordinarily must follow the choice-of-law rules of the State in which it sits." *Id.* at 64-65 (citations omitted).

This adjusted analysis "is referred to as the modified *Atlantic Marine* analysis." *DePuy*, 28 F.4th at 963. "[A]pplication of the modified *Atlantic Marine* analysis 'presupposes a contractually valid forum-selection clause.'" *Id.* (quoting *Atl. Marine*, 571 U.S. at 62 n.5.)

III.   Analysis

A.     **Validity Of The SDA's Forum-Selection Clause**

The parties do not dispute the validity of the forum-selection clause in the 2018 NDA. Rather, the parties' arguments focus on whether the 2018 NDA superseded the SDA, thereby invalidating the SDA's forum-selection clause.

As noted, the SDA contains a forum-selection clause stating that "any dispute regarding this Agreement or the rights and obligations herein will be heard in the state or federal courts having jurisdiction for Maricopa County, Arizona." (Doc. 1-4 at 32.) Although Plaintiff contends the SDA's forum-selection clause requires this action to be litigated in Arizona (Doc. 19 at 3), "application of the *Atlantic Marine* analysis presupposes a contractually valid forum-selection clause," *DePuy*, 28 F.4th at 963 (cleaned up), and Defendant contends the SDA's forum-selection clause is no longer valid because the SDA has been superseded by the 2018 NDA. In other words, "the existence rather than the scope" of the SDA's forum-selection clause "is at issue here." *Suski v. Coinbase, Inc.*, 55 F.4th 1227, 1230 (9th Cir. 2022).[14] The "scope" of a forum-selection clause "concerns how widely it applies, not whether it has been superseded by a subsequent agreement." *Id.*

---

[14]     *Suski* and several other cases discussed in this section addressed whether an arbitration clause had been superseded, but that is a distinction without a difference because "an agreement to arbitrate is, in effect, a specialized kind of forum-selection clause." *Lee v. Fisher*, 70 F.4th 1129, 1142 (9th Cir. 2023) (cleaned up).

Thus, the Court must interpret the 2018 NDA to determine whether it supersedes the SDA. Interpreting the 2018 NDA is a matter of contract law, and the 2018 NDA provides that it "shall be governed in accordance with the laws of the State of Ohio without regard to the conflict of laws." (Doc. 1-4 at 23.) Plaintiff has not challenged the validity or enforceability of the choice-of-law provision in the 2018 NDA.[15]

### 1. Ohio Law

The relevant standard for contractual interpretation in Ohio is as follows:

> Under Ohio law, the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court. The role of courts in examining contracts is to ascertain the intent of the parties. The intent of the parties is presumed to reside in the language they choose to use in their agreement. Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract. However, extrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning. Nevertheless, a court is not permitted to alter a lawful contract by imputing an intent contrary to that expressed by the parties in the terms of their written contract.

> Contractual language is ambiguous only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations. Courts may not use extrinsic evidence to create an ambiguity; rather, the ambiguity must be patent, i.e., apparent on the face of the contract. In determining whether contractual language is ambiguous, the contract must be construed as a whole, so as to give reasonable effect to every provision in the agreement. Common words appearing in the written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument.

*Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763-64 (6th Cir. 2008) (cleaned up).

…

…

…

---

[15]    Plaintiff argues that "the Court should consider the issue of whether the [SDA] is operative pursuant to the law the parties chose for that agreement—Arizona law." (Doc. 19 at 11.) But determining whether the 2018 NDA supersedes the SDA requires the Court to interpret the 2018 NDA, specifically its language regarding its scope. Defendant does not challenge the enforceability of the choice of law clause in the 2018 NDA but merely states that "even if Ohio law does govern the 2018 NDA, Arizona law governs [the SDA]." (*Id.* at 7.) Thus, Ohio law governs the Court's interpretation of the 2018 NDA.

- 17 -

2.     Scope Of The 2018 NDA

The 2018 NDA provides:

The Parties acknowledge that they may have participated in prior discussions where confidential and proprietary information may have been disclosed by a Party, and each Party agrees that this Agreement shall govern the discussions, including, but not limited to, any materials provided prior to the execution of this Agreement. The Parties agree that this Agreement supersedes [the 2015 NDA]. As of the Effective Date, this Agreement governs the Parties' confidentiality obligations relating to all information exchanged over the course of [the 2015 NDA]. The Parties further agree that the Agreement governs any and all discussions where confidential and proprietary information was exchanged between March 17, 2015 and the Effective Date.

[ . . . ]

This Agreement constitutes the entire agreement between the Parties and supersedes any prior discussions or agreements, whether oral or written, between the Parties regarding the subject matter herein.

(Doc. 1-4 at 22-23.)

The key language for determining whether the 2018 NDA supersedes the SDA is the passage in the 2018 NDA expressing the parties' intent to "supersede[]" any "prior discussions or agreements" between the parties "regarding the subject matter herein." This language is not ambiguous. The plain meaning of "subject matter" is "the thing being discussed," a definition that is commonly understood and has no special legal import. *Compare* Black's Law Dictionary, https://thelawdictionary.org/subject-matter/ ("The thing in controversy, or the matter spoken or written about"), *with* Merriam-Webster, https://www.merriam-webster.com/dictionary/subject%20matter ("matter presented for consideration in discussion, thought, or study").

The subject matter of the 2018 NDA is the limited permissible uses, impermissible uses, ownership, and confidentiality obligations regarding a broad range of materials[16] disclosed between the parties in furtherance of "ongoing mutual business pursuits and programs"—materials including, as relevant here, "inventions," "software code," and "all information of a technical, engineering, operational, financial or economic nature or which

---

[16]     The 2018 NDA expressly governs "any materials provided prior to the execution of this Agreement." (Doc. 1-4 at 22.)

is related to product design and development"—and the return of these materials.  (Doc. 1-4 at 20-23.)

The subject matter of the SDA is the limited permissible uses, impermissible uses, ownership, and confidentiality obligations regarding the Software ("machine-readable, machine-executable versions" of certain "software and firmware products") and Evaluation Materials ("the Software in object code form," plus Documentation consisting of "manuals, specifications, drawings, and instructions," as well as, *inter alia*, "derivative works," "inventions," "designs," "technology," and "information or materials whatsoever" arising out of the Software or Documentation) and the return of these materials.  (Doc. 1-4 at 25-35.)

Because the subject matter of both contracts is, in short, limitations on the use and disclosure of certain materials, the SDA is an "agreement[] . . . between the Parties regarding the subject matter" of the 2018 NDA, and therefore is superseded in its entirety by the 2018 NDA (Doc. 1-4 at 23), if the materials discussed in the SDA fall into the broad range of materials discussed in the 2018 NDA.  The Court has no trouble concluding that they do.  Plaintiff contends that the Software is not the same as the "software code" included in the list of materials covered by the 2018 NDA: "Comparing the two agreements, the 2018 NDA mentions 'software code' in a long list of potential proprietary materials, [but] never mentions the term 'software.'"  (Doc. 19 at 8.)  Putting aside that Plaintiff never explains how one can mention "software code" without mentioning "software" and provides no explanation or argument as to how these terms are unrelated, there can be no doubt that the Software falls into one or more of various *other* specified categories of Proprietary Information covered in the 2018 NDA: "inventions," "designs," "ideas," and/or "information of a technical, engineering, [or] operational . . . nature or which is related to product design."  (Doc. 1-4 at 20.)  The complaint discusses how "Dr. Kenneth Falcone, an engineer with decades of experience in research, testing, and development," developed the Software over the course of "three decades."  (Doc. 1-4 at 4 ¶ 7, 11 ¶ 73.)  Whether or not the Software is "software code," it is certainly an invention,

design, and/or idea. Moreover, the SDA does not just apply to the Software; it also applies to the Evaluation Materials, defined in part as "the Software in object code form" and also comprising "inventions," "designs," and "technology." (Doc. 1-4 at 25-35.) It is thus clear that the "subject matter" of the 2018 NDA encompasses the "subject matter" of the SDA.

Bedford makes much of the fact that the 2018 NDA states that it supersedes the 2015 NDA but "does not mention" the SDA. (Doc. 19 at 4.) It is true that § VIII of the 2018 NDA explicitly mentions supersession of the 2015 NDA and not the SDA, but Bedford ignores what follows:

> The Parties agree that this Agreement supersedes the [2015 NDA]. As of the Effective Date, this Agreement governs the Parties' confidentiality obligations relating to all information exchanged over the course of the [2015 NDA]. *The Parties further agree that the Agreement governs any and all discussions where confidential and proprietary information was exchanged between March 17, 2015 and the Effective Date.*

(Doc. 1-4 at 22, italics added.) Although it is true that "[u]nder the maxim *expressio unius est exclusio alterius,* the mention of one thing implies the exclusion of another," it is also true that "the maxim *expressio unius est expressio alterius* is not a rule of law but, rather, is a rule of construction and requires caution in its application." *Bd. of Educ., Erie Cnty. Sch. Dist. v. Rhodes*, 477 N.E.2d 1171, 1175-76 (Ohio Ct. App. 1984) (cleaned up). Only "when ambiguities exist" may the maxim "be used to aid the court in determining the intentions behind a certain provision." *Id.* at 1176. Here, there are no ambiguities. The 2018 NDA unambiguously governs all disclosures made during the time period in which the SDA was entered into and was effective. Furthermore, as discussed above, the 2018 NDA expressly supersedes any previous agreement regarding its subject matter, and the SDA is an agreement regarding its subject matter. The express statement that the 2015 NDA was superseded does not preclude a determination that the SDA was superseded as well.

At oral argument, Bedford's counsel suggested that the fact that the 2018 NDA governs any and all "discussions" between March 17, 2015 and the 2018 NDA's effective date where confidential and proprietary information was exchanged does not implicate the

SDA because the parties could have exchanged such information pursuant to the SDA in a manner that did not "necessarily even have to involve discussions." This argument is unpersuasive. As previously discussed, the 2018 NDA also contains the following clause: "This Agreement constitutes the entire agreement between the Parties and supersedes any prior discussions or agreements, whether oral or written, between the Parties regarding the subject matter herein." (Doc. 1-4 at 23.) Regardless of whether the word "discussions" only applies to certain forms of information exchanges, the word "agreements" is surely broad enough to encompass the SDA.

Bedford also argues that the SDA and the 2018 NDA could not share the same subject matter because the "Purpose" sections of the SDA and 2018 NDA differ in verbiage. (Doc. 19 at 5.) This argument is unavailing because "purpose" and "subject matter" are not synonymous—two documents can address the same subject matter but have different purposes. For example, two contracts could address the same subject matter (*e.g.*, permissible uses of disclosed materials) but have opposite purposes—one could be broadening the range of permissible uses and the other could be narrowing the range of permissible uses. Here, the parties agreed that the 2018 NDA would supersede "any prior discussions or agreements, whether oral or written, between the Parties regarding the subject matter herein" (Doc. 1-4 at 23), not "regarding the purpose herein," and the Court must interpret the contract as written.[17]

---

[17] At any rate, the "Purpose" sections of both contracts are inexplicit and broad, such that the stated purposes overlap. The stated "Purpose" of the SDA is to set forth "terms and conditions" for Resonant's use of the Software. (Doc. 1-4 at 25.) The generic phrase "terms and conditions" can encompass a wide range of topics. The actual range of topics is easily ascertainable by skimming through the section headings, and as discussed above, those topics are subsumed by the topics covered in the 2018 NDA. The stated "Purpose" of the 2018 NDA is that Bedford and Resonant "seek to continue their discussions relating to ongoing mutual business pursuits and programs, which may require the disclosure of certain confidential and proprietary information." (Doc. 1-4 at 20.) The 2018 NDA also notes that the parties "may have participated in prior discussions where confidential and proprietary information may have been disclosed by a Party, and each Party agrees that this Agreement shall govern the discussions, including, but not limited to, any materials provided prior to the execution of this Agreement." (*Id.* at 22.) Thus, the "Purpose" of the 2018 NDA was to create a new, superseding agreement refining the terms and conditions applicable to disclosed materials, regardless of whether those materials were disclosed before or after execution of the 2018 NDA.

Bedford also argues that the 2018 NDA could not have superseded the SDA because "three days after executing the 2018 NDA . . . Resonant took a separate action to terminate [the SDA]." (Doc. 19 at 5.) According to Bedford, this action demonstrates that "at the time Resonant executed the 2018 NDA, it did not believe the 2018 NDA's integration clause implicated [the SDA]." (*Id.*) In its brief, Bedford took the position—abandoned at oral argument—that Arizona law should govern whether extrinsic evidence is admissible to aid the Court's determination of whether the 2018 NDA supersedes the SDA. Bedford asserted that under Arizona law, "the Court may consider facts outside the four corners of the 2018 NDA—including actions Resonant took pursuant to the [SDA] after execution of the 2018 NDA." (*Id.* at 11.) Specifically, Bedford cited Arizona law to support the proposition that extrinsic evidence was admissible to explain "any ambiguities in the parties' agreement." *Id.* (citation omitted). Bedford did not, however, identify any ambiguities or claim that any language in the parties' contracts was ambiguous.

In reply, Resonant asserted: "Bedford's reliance on the fact that Resonant took steps to comply with the 2016 SDA in the wake of its termination of the parties' relationship does not create ambiguity in the language of the 2018 NDA. The language of that agreement is clear . . . ." (Doc. 21 at 11.)

During oral argument, Bedford abandoned its previous position—that Arizona law should govern the inquiry[18] and that extrinsic evidence was admissible only if the contractual language was ambiguous—and advanced the new argument that consideration of extrinsic evidence was permissible, regardless of whether there was ambiguity in either contract, under Comment c to the Restatement (Second) of Contracts § 213, which is entitled "Effect of Integrated Agreement on Prior Agreements (Parol Evidence Rule)." Section 213 provides:

> (1) A binding integrated agreement discharges prior agreements to the extent that it is inconsistent with them.

---

[18] When, after citing various Ohio cases, Bedford's counsel began discussing an Arizona case, the Court asked "Why would I be looking at Arizona cases to evaluate the integration clause of the 2018 NDA which expressly says it's governed by Ohio law?" Bedford's counsel replied, "You don't."

(2)   A binding completely integrated agreement discharges prior agreements to the extent that they are within its scope.

(3)   An integrated agreement that is not binding or that is voidable and avoided does not discharge a prior agreement. But an integrated agreement, even though not binding, may be effective to render inoperative a term which would have been part of the agreement if it had not been integrated.

Meanwhile, Comment c to § 213 provides:

> Where the parties have adopted a writing as a complete and exclusive statement of the terms of the agreement, even consistent additional terms are superseded. But there may still be a separate agreement between the same parties which is not affected. To apply the rule of Subsection (2) the court in addition to determining that there is an integrated agreement and that it is completely integrated, must determine that the asserted prior agreement is within the scope of the integrated agreement. Those determinations are made in accordance with all relevant evidence, and require interpretation both of the integrated agreement and of the prior agreement.

As a preliminary matter, as noted previously in this order, Ohio law governs the Court's interpretation of the 2018 NDA, including its language delineating its scope. It is not clear that Ohio law endorses Comment c to § 213 of the Restatement (Second) of Contracts. Although Restatements can be "a useful beginning point for a discussion of general . . . principles," *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 755 (1998), Ohio courts do not automatically follow the Restatements' teachings, which do not override otherwise binding Ohio decisional law. *See, e.g., Qiusha Ma. v. Bon Appetit Mgmt. Co.*, 785 F. App'x 293, 296 (6th Cir. 2019) ("Simply put, the Ohio Supreme Court has not adopted the Restatement (Third) of Torts and instead continues to apply the Restatement (Second) of Torts.") (citation omitted); *Brown v. Scioto Cty. Bd. of Comm'rs*, 622 N.E.2d 1153, 1158 (Ohio Ct. App. 1993) ("[N]umerous Ohio decisions do not appear to follow the Restatement limitation on restricting injury to property rights."); *Cincinnati Gas & Elec. Co. v. General Elec. Co.*, 656 F. Supp. 49, 67 (S.D. Ohio 1986) ("From the outset, we note that Ohio has not adopted the tort of innocent misrepresentation and the application of strict liability, encompassed by Restatement (Second) of Torts § 552(C).").

Bedford asserted at oral argument that "both Ohio and Arizona courts analyze integration clauses under Restatement (Second) of Contracts § 213(2)." But this assertion

1  is not borne out in the cases Bedford cited or the Court's independent research.  Whereas

2  "Arizona has adopted the Restatement (Second) of Contracts § 213 (1981) as the 'general

3  rule of contract law' regarding integration clauses," *Dunn v. FastMed Urgent Care PC*,

4  424 P.3d 436, 440 (Ariz. Ct. App. 2018), the Court can find no such proclamation by an

5  Ohio court.  At most, a few Ohio cases have cited § 213, but citing to a line in a source is

6  a far cry from wholesale adoption of the source in its entirety.

7       Indeed, in *Russell v. Daniels-Head & Assocs., Inc.*, 1987 WL 13943, *5 (Ohio Ct.

8  App. 1987), the court outlined the "two divergent views" that exist "in determining the

9  applicability of the parol evidence rule": (1) the "Corbin view," which has been "adopted

10  and approved by the Restatement," under which "the determination requires a review of

11  not only the writing but of all relevant evidence extrinsic to the writing" and (2) "the

12  traditional Williston view," under which "the determination is limited to an examination

13  of the four corners of the document."  *Id.*  The court noted that "the Williston view of

14  confining the initial search for an ambiguity to the four corners of the written document is

15  applicable in Ohio.  *Id.*  at *5 n.5, *9.

16       Cases applying Ohio law appear to exclude extrinsic evidence when determining

17  whether an agreement supersedes an earlier agreement if the court is able to conclude,

18  based on a comparison of the two agreements, that the two agreements share the same

19  "subject matter," such as when the latter agreement contains "plain and unambiguous

20  language" delimiting its scope.  *Lexington Ins. Co. v. DunnWell, LLC*, 69 N.E.3d 1066,

21  1074 (Ohio Ct. App 2016) ("Based on the plain language of the 2009 subcontractor

22  agreement, it is clear that the parties intended that contract to govern work performed by

23  ABCO on behalf of DunnWell as it related to kitchen exhaust cleaning.  By contrast, the

24  plain language of the 2010 agreement indicates the parties' intent that that contract governs

25  a separate and distinct type of work, specifically fire prevention services.  As the two

26  agreements governed different 'subject matters[s],' by its plain and unambiguous language,

27  the 2010 agreement did not supersede the 2009.  As a review of the plain language of the

28  agreements resolves this matter, this Court shall not engage in further construction or

- 24 -

consideration of any extrinsic evidence."). For example, in *Elec. Merch. Sys. LLC v. Gaal*, 58 F.4th 877 (6th Cir. 2023), the Sixth Circuit addressed whether a latter contract (the "2019 Agreement") superseded an earlier contract (the "2014 Agreement"). The 2019 Agreement "contained an explicit integration clause, which reads: 'This Agreement, including the Application and any other documents executed in conjunction herewith, constitutes and expresses the entire agreement and understanding between [Procom], Bank and EMS with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, inducements, or conditions, by Bank, EMS or its sales representative, whether expressed or implied, oral or written.'" *Id.* at 881. The court determined that the 2019 Agreement "addressed the same subject as the first contract but with slightly altered terms (beneficial to EMS)." *Id.* Having determined that the two contracts addressed the same subject matter, the court had no trouble determining that the 2014 Agreement fell within the scope of the 2019 Agreement:

> [The] language [of the 2019 Agreement's integration clause] clearly and unambiguously provides that the terms of the 2019 Agreement replace the terms of the 2014 Agreement, terminating the 2014 Agreement. No extrinsic evidence is needed or admissible to interpret these unambiguous terms. The 2019 guaranty provision . . . therefore terminated and replaced the 2014 guaranty provision that Gaal signed. Not once in its briefs does EMS even attempt to argue that the language in the 2019 Agreement was ambiguous, offer an alternative reading of its language, or explain why EMS's alleged intent is not reflected in the terms of the contract that it itself drafted.

*Id.* at 887.

Here, Bedford does not identify or assert any ambiguity in either the 2018 NDA or the SDA. Furthermore, it is difficult to see how the extrinsic evidence Bedford offers could indicate whether the two contracts have the same subject matter, a query that seems, by its nature, to point toward examining the contracts themselves. "In interpreting a contract under Ohio law, . . . evidence of subjective intent of the parties is irrelevant." *Id.* at 887. Whether Resonant held a subjective belief—either at the time of executing the 2018 NDA, or three days later—that the 2018 NDA superseded the SDA is irrelevant to the Court's legal determination as to whether the SDA is an agreement regarding the subject matter of the 2018 NDA. Even if Ohio were to embrace Comment c to § 213 of the Restatement

(Second) of Contracts, only "relevant" evidence would be considered.

The Ohio cases that Bedford cited during oral argument, *Snyder Dev. Co. v. AutoZone, Inc.*, 2019 WL 3779881 (S.D. Ohio 2019), and *Edwards v. Thomas H. Lurie & Assocs.*, 1995 WL 12126 (Ohio Ct. App. 1995), do not compel a different conclusion. *Snyder* had nothing to do with the superseding effect of a subsequent integrated contract and simply noted that "[t]he presence of actual or potential ambiguity in the contract at issue will defeat a motion to dismiss based upon the parol evidence rule." 2019 WL 3779881 at *3. *Edwards*, a case in which fraudulent inducement was alleged, emphasized that under Ohio law, motions to dismiss are "viewed with disfavor" and can be granted "only if it appears beyond doubt that [the plaintiff] can prove no set of facts entitling him to relief," deeming all pleaded facts as true and taking all factual inferences in the plaintiff's favor. 1995 WL 12126 at *2. For this reason, and because a "major exception" to the parol evidence rule is an allegation that the contract was formed due to fraud, the court concluded that a motion to dismiss based on the parol evidence rule should not have been granted. *Id.* at *3. These principles are of no assistance to Bedford here, where there is no doubt that the 2018 NDA is integrated and no one has suggested it was fraudulently induced or otherwise invalid.[19]

At any rate, even if the Court were to consider the evidence that Resonant took steps to terminate the SDA three days after executing the 2018 NDA, this evidence is too ambiguous to change the outcome here. Although that effort can potentially be interpreted, at least in isolation, as proof that Resonant didn't understand the 2018 NDA as superseding the SDA, it can also be viewed as a simple belt-and-suspenders maneuver by Resonant. Meanwhile, as discussed above, the language in the 2018 NDA regarding its scope is broad and unambiguous—it "supersedes any prior discussions or agreements, whether oral or written, between the Parties regarding the subject matter herein" and, if that weren't enough, it also expressly governs the parties' "prior discussions where confidential and

---

[19] [T]he presence of an integration provision does not vitiate the principle that parol evidence is admissible to prove fraud." *Galmish v. Cicchini*, 734 N.E.2d 782, 790 (Ohio 2000).

proprietary information may have been disclosed." (Doc 1-4 at 22.) The Court cannot see how a single, ambiguous piece of evidence could compel it to reject the unambiguous meaning of the actual language of the 2018 NDA and the straightforward conclusion that the subject matter of the SDA falls within the subject matter of the 2018 NDA.[20]

### B.  The Claims

#### 1.  Counts Two, Three, And Four

##### a.  **Count Two**

In Count Two, Bedford asserts that "Resonant breached its duty of good faith and fair dealing under each of the three contracts between the parties [*i.e.*, the 2015 NDA, the SDA, and the 2018 NDA] by directly or indirectly using Bedford's software to perform [government] contracts" and that "Resonant breached its duty of good faith and fair dealing under the 2015 NDA by using the software in connection with securing" a patent that predates the SDA. (Doc. 1-4 at 15 ¶¶ 106-07.)

The forum-selection analysis as to Count Two is straightforward. That claim expressly arises from all three of the parties' contracts, but the 2015 NDA and the SDA have been superseded. This leaves the 2018 NDA, whose forum-selection clause specifies that covered disputes "shall be venued exclusively in either (a) the Greene County, Ohio Court of Common Pleas, or (b) the United States District Court for the Southern District of Ohio (Dayton)." (Doc. 1-4 at 23.) Bedford does not argue that this clause is invalid or unenforceable, and indeed, Bedford implicitly concedes that the clause is enforceable as to any claim within its scope. (Doc. 20 at 4 n.1.) Thus, Count Two is subject to the forum-selection clause in the 2018 NDA.

…

…

---

[20] During oral argument, Bedford also suggested that Resonant's efforts, after executing the 2018 NDA, to destroy information in compliance with the SDA's destruction procedures serves as evidence that the parties did not intend for the 2018 NDA to supersede the SDA. This argument fares no better than the argument regarding Resonant's effort to terminate the SDA—the acts of destruction serve at most as an ambiguous piece of evidence regarding Resonant's intent that is insufficient to override the unambiguous plain meaning of both contracts.

### b. **Counts Three and Four**

In Count Three, "unjust enrichment (in the alternative)," Bedford alleges that Resonant obtained millions of dollars' worth of government contracts by using the Software, which "was Bedford's protected intellectual property"; that Resonant terminated its relationship with Bedford "then impermissibly" used the Software; and that "[a]s a result, Bedford received nothing from the contracts." (Doc. 1-4 ¶¶ 111-15.)

Count Four, "tortious interference with a business expectancy," is premised on the assertion that "[h]ad Resonant been selected for a contract based on the use of Bedford's software, Bedford would expect compensation for the use of its software in performance of said contract." (*Id.* at 16 ¶ 122.) Bedford's theory is that Resonant should have "brought Bedford in as a third-party" to Resonant's government contracts and failure to do so was "interference" with Bedford's "opportunity" to benefit from Resonant's government contracts. (*Id.* at 17 ¶¶ 126-27.)

Count Four is a tort claim. "[F]orum selection clauses can be equally applicable to contractual and tort causes of action." *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 (9th Cir. 1988). "Whether a forum selection clause applies to tort claims depends on whether resolution of the claims relates to interpretation of the contract." *Id.*

Count Three sounds in neither contract nor tort, but it is likely also governed by the same standard articulated in *Manetti-Farrow*. *FCE Benefit Administrators, Inc. v. Training, Rehab. & Dev. Inst., Inc.*, 2015 WL 2173744, *4 (N.D. Cal. 2015) (unjust enrichment claim subject to *Manetti-Farrow* standard); *Lee v. Fisher*, 70 F.4th 1129, 1137 (9th Cir. 2023) (affirming district court's dismissal of action due to forum-selection clause where one of the claims was for unjust enrichment); *Adema Techs., Inc. v. Wacker Chem. Corp.*, 657 F. App'x 661, 662 (9th Cir. 2016) ("Adema's unjust enrichment, conversion, and aiding and abetting claims likewise relate to the agreement. None could go forward had the contract not existed. Accordingly, we conclude that the forum-selection clause applies to all of Adema's claims.").

Resonant argues as follows:

There is little question that the unjust enrichment and tortious interference claims require interpretation of the contract. First, the unjust enrichment claim is simply an alternative to the breach of contract claims Bedford asserts, and its very existence turns on whether Bedford has a valid breach of contract claim covering use of the Software. Although not a "tort" claim, the unjust enrichment claim indisputably relates to the interpretation of the 2018 NDA, and is thus covered by the forum selection clause. The same is true for the tortious interference claim, which is based on Bedford's assertion that Resonant had an obligation to license the Software from it to perform the Defense Contracts. This claim is governed, and indeed foreclosed by the 2018 NDA, which provides that "[t]his Agreement shall not be construed or interpreted as obligating either Party to enter into a further agreement or contractual arrangement with the other Party in any way."

(Doc. 15 at 14-15.)

Bedford did not address these arguments in its response. Moreover, regarding Counts Two, Three, and Four, the position Bedford took at oral argument was that "we need to sever off" these claims and transfer them to Ohio, at which point Bedford might "decide not to move forward with these claims." Although the Court could thus treat the transfer request as to Counts Three and Four as unopposed, the Court will briefly address them.

As for Count Three, the unjust enrichment claim, Arizona courts "have repeatedly held that the existence of a contract specifically governing the rights and obligations of each party precludes recovery for unjust enrichment." *USLife Title Co. of Arizona v. Gutkin*, 732 P.2d 579, 584 (Ariz. Ct. App. 1986). This order has discussed at length the various contracts specifically governing the parties' rights and obligations regarding the Software and its permissible and impermissible uses, including the 2018 NDA. Thus, the Court agrees with Resonant that the "very existence" of this claim "turns on whether Bedford has a valid breach of contract claim"—which means that Count Three requires interpretation of the 2018 NDA, thereby triggering that contract's forum-selection clause. *Yei A. Sun v. Advanced China Healthcare, Inc.,* 901 F.3d 1081, 1086 (9th Cir. 2018) (explaining that an "arising out of" forum-selection clause is triggered if a claim raises "disputes relating to the interpretation and performance of the contract itself").

As for Count Four, Bedford's theory is that Resonant should have "brought Bedford in as a third-party" to Resonant's government contracts and that Resonant's failure to do

1    so was "interference" with Bedford's "opportunity" to benefit from Resonant's

2    government contracts. (Doc. 1-4 at 17 ¶¶ 126-27.) These allegations once again will

3    require interpretation of the terms of the parties' contracts, including the 2018 NDA.

4    Bedford alleges that "Resonant was aware that it was not permitted to use the software in

5    performance of contracts it was awarded" (Doc. 1-4 at 16 ¶ 121), but this awareness could

6    not have been separate from contractual terms—the parties' contracts have, at all times

7    relevant to this litigation, governed permissible and impermissible uses of the Software.

8    Bedford alleges that "[h]ad Resonant been selected for a contract based on the use of

9    Bedford's software, Bedford would expect compensation for the use of its software in

10   performance of said contract. It is for this reason that the Software Demonstration

11   Agreement strictly prohibited use of the software in performance of contracts, and that the

12   agreement prohibited Resonant from acting to the detriment of Bedford." (*Id.* ¶ 122.)

13   Thus, the claim will require interpretation of the parties' contracts, including the 2018 NDA

14   (which is the only contract with a still-valid forum-selection clause).

15   For these reasons, the forum-selection clause in the 2018 NDA applies to Counts

16   Three and Four.

17        c.    **Transfer Analysis As To Counts Two, Three, And Four**

18   As explained above, Counts Two, Three, and Four are all governed by the forum-

19   selection clause in the 2018 NDA.

20   The modified *Atlantic Marine* analysis as to Counts Two, Three, and Four compels

21   the conclusion that all of those claims should be transferred to Ohio pursuant to the forum-

22   selection clause in the 2018 NDA. When, as here, claims are governed by a valid forum-

23   selection clause, "a district court may consider arguments about public-interest factors

24   only. Because those factors will rarely defeat a transfer motion, the practical result is that

25   forum-selection clauses should control except in unusual cases. Although it is conceivable

26   in a particular case that the district court would refuse to transfer a case notwithstanding

27   the counterweight of a forum-selection clause, such cases will not be common." *Atl.*

28   *Marine*, 571 U.S. at 64 (cleaned up). This is not such a case, as all of the public interest

either weigh in favor of a transfer to Ohio or are neutral. "Public-interest factors may include the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; and the interest in having the trial of a diversity case in a forum that is at home with the law." *Id.* at 62 n.6 (cleaned up). Here, the Ohio courts are less congested than the Arizona courts by at least some measures (Doc. 15 at 16), much of Resonant's challenged conduct occurred in Ohio, and the 2018 NDA has an Ohio choice-of-law clause. Notably, Bedford does not make any contrary arguments regarding the public-interest factors—all of its arguments against transfer are premised on its mistaken contention that the Arizona forum-selection clause in the SDA applies here.

### 2. Count One

Although Count One is generically labeled "breach of contract" and incorporates allegations in the complaint pertaining to all three contracts (Doc. 1-4 at 13 ¶ 91), the allegations specific to Count One focus on the SDA—particularly the clauses in the SDA prohibiting use of "confidential information" to Bedford's "detriment," prohibiting attempts to "reverse engineer" the Software or develop "derivative works," and failing to discontinue use of the Software after termination of the SDA. (*Id.* ¶¶ 92-95, 97.) Count One also alleges that Resonant breached the SDA by using the Software in the performance of contracts (other than contracts with Matrix Research and Raytheon) and by disclosing "details regarding the capabilities" of the Software to Fischer "so Fischer could develop a derivative software." (*Id.* at 13-14 ¶¶ 96, 98.)

The parties' arguments about whether the 2018 NDA's forum-selection clause governs a claim for breach of the SDA (and if so, why) are not entirely consistent. In its transfer motion, Resonant takes the position that "[a]s the 2018 NDA governs the contractual relationship between Bedford and Resonant regarding the Software and all 'Proprietary Information,' all of Bedford's breach of contract claims are subject to the 2018 NDA's Ohio forum selection clause." (Doc. 15 at 14.) This position has no bearing on the merits of the action—it only implicates the forum-selection clause. On the other hand, Resonant also takes the position that "to the extent Bedford's allegations are true, they must

constitute a breach of the 2018 NDA" (*id.* at 13), a position with implications as to the merits.  Meanwhile, although Bedford has consistently maintained that Count One should not be transferred to Ohio, its position has always been based on the premise that the 2018 NDA did not supersede the SDA.  Bedford never argued, in the alternative, that if the SDA (including its forum-selection clause) is superseded, Count One nevertheless should stay in Arizona.  Although Bedford made a fleeting, undeveloped alternative request for the Court to sever the claims governed by the forum-selection clause in the 2018 NDA from the other claims in this action and only transfer the severed claims to Ohio (Doc. 20 at 4 n.1), a request Bedford reiterated more emphatically at oral argument,[21] this request assumes that Count One belongs in Arizona because the SDA's forum-selection clause remains valid.

At any rate, the Court need not resolve whether the forum-selection clause in the 2018 NDA governs a claim for breach of the SDA (or whether any breach of contract claim in this action is necessarily a claim for breach of the 2018 NDA) because the Court agrees with Resonant that, for judicial efficiency reasons alone, Count One should be transferred to Ohio alongside Counts Two, Three, and Four.  The Court concludes in its discretion that severing Counts Two, Three, and Four and transferring those three claims while keeping Count One in Arizona—even giving due consideration to the private-interest factors— would result in needless duplication and inefficiency given that all of the claims are intertwined in various respects.  *Cf. Nat'l Prods. v. Wireless Accessory Solutions, LLC*, 2018 WL 1709494, *3-6 (W.D. Wash. 2018) (concluding that entire action should be transferred to the Central District of California, as opposed to severing the patent from the non-patent claims and only transferring the former, because all of the claims "overlap[ped] factually" and severance would result in "inconvenience to witnesses in having to be

---

[21] Bedford seemed to suggest during oral argument that severance would not be prejudicial to Resonant or result in judicial inefficiency because Bedford might choose to dismiss Counts Two, Three, and Four if they were severed from Count One and then transferred to Ohio: "[W]e might not pursue those claims at all if it's going to cause the level of confusion that we've created."  The Court appreciates this candor but must make its severance determination on the present record, not based on the possibility that Bedford might choose to dismiss the Ohio action after severance and transfer.

deposed and potentially to give testimony in two different cases in two separate jurisdictions" and raise "concerns over judicial efficiency," which were "paramount"). *See generally W. Watersheds Project v. Bernhardt*, 2019 WL 3022188, *3 (D. Idaho 2019) ("There is broad discretion in deciding whether to sever claims that are discrete and separate, but a court will abuse its discretion if the severance separates an otherwise essentially unitary problem.") (cleaned up).

Accordingly,

**IT IS ORDERED** that Defendant's motion to transfer (Doc. 15) is **granted**. The Clerk of Court shall transfer this action in its entirety to the United States District Court for the Southern District of Ohio, Western Division at Dayton.

**IT IS FURTHER ORDERED** that Defendant's motion to dismiss (Doc. 16) shall remain pending for resolution following the transfer of this action.

Dated this 15th day of August, 2024.

Dominic W. Lanza
United States District Judge